UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

AUGUSTINA BALU,

                              Plaintiff,                <u>COMPLAINT</u>
                                                      12 CV 1071 (GBD)

      - against -

THE CITY OF NEW YORK and DENIS
McAULIFFE, individually and in his official
capacity as an employee of the New York City
Department of Police,

                             Defendants.          **Jury Trial Demanded**

-------------------------------------------------------------x

       Augustina Balu, by her attorney, The Law Office of Fred Lichtmacher, PC alleges the

following upon information and belief as her Complaint:

<u>Nature of the Action</u>

       1.      This civil rights action arises from a years-long campaign of sexual harassment

and retaliation perpetrated against Plaintiff Augustina Balu, a Police Officer, by Defendant Denis

McAuliffe, a Lieutenant in the Police Department Transit Bureau.

       2.      Beginning in or about 2005 and continuing to this day, Defendant McAuliffe, a

supervisor, sexually harassed and discriminated against Plaintiff due to her gender and retaliated

or caused retaliation against her because of her refusal of McAuliffe's sexual advances and her

own complaints of discrimination and harassment against McAuliffe.

       3.      Defendant McAuliffe's campaign of harassment and retaliation against Tina Balu

included unwelcomed physical and verbal sexual advances, false allegations to the Department,

numerous derogatory comments based on Plaintiff's gender, derogatory comments based on

others' genders.

4.     Despite the ongoing and continuing harassment and retaliation, and despite that

City's Police Department knew or should have known of Defendant McAuliffe's misconduct, the

Department enabled and ratified Mr. McAuliffe's discriminatory and retaliatory conduct and

permitted a truly hostile work environment to develop.  The Department of Police permitted

Defendant McAuliffe's ongoing and related instances of discriminatory and retaliatory

misconduct to go unremedied for so long as to amount to a discriminatory practice.


<u>Jurisdiction and Venue</u>

5.     This action arises under 42 U.S.C. §2000e-2(a) and §2000e-3(a), i.e., Title VII, as

well as under the laws of the State of New York, N.Y. Executive Law § 296 et seq, and the

Administrative Code of the City of New York § 8-107 et seq.  This Court has subject matter

jurisdiction pursuant to 28 U.S.C. §1331, §1343(3) and §1343(3).  Plaintiff requests that this

Court exercise pendent jurisdiction over those state law claims arising out of the same common

nucleus of operative facts as do Plaintiff's federal claims pursuant to 28 U.S.C. § 1367.

6.     Under 28 U.S.C. §1391(b) and (c), venue is proper in the Southern District of

New York because defendant City of New York resides in and a substantial part of the events or

omissions giving rise to the claims occurred in that judicial District.

<u>Parties</u>

7.     Plaintiff AUGUSTINA BALU is a citizen of the United State of America residing in the State and City of New York, Queens County.  She is is woman whose date of birth is August 22, 1970.  At all times relevant, she was an employee of the City of New York Department of Police, serving as a Police Officer.

8.     Defendant CITY OF NEW YORK is a Municipal Corporation within New York State.  Pursuant to its Charter, the City of New York has established and maintains the New York City Department of Police ("Department") as a constituent department or agency.  At all times relevant, the City of New York employed the personnel involved in the incidents underlying this lawsuit.

9.     Defendant CITY OF NEW YORK, through its Department, employs more than five hundred employees for each working day in each of twenty or more calendar weeks in the current, preceding and in all relevant calendar years.

10.     Defendant DENIS McAULIFFE  was, at all times relevant, a duly appointed and acting Lieutenant employed by the Department and assigned to the Transit Bureau Headquarters in Brooklyn, New York.  The CITY OF NEW YORK had employed Defendant McAULIFFE in that position since 1992.

11.     At all times relevant, Defendant McAuliffe was acting under color of state law.

12.     Defendant McAuliffe was, at all times relevant, an agent, servant and employee acting within the scope of his employment by Defendant City of New York.

Condition Precedent to Suit

13.     On or about July 11, 2011, and within one hundred and eighty days of the last act

of the ongoing conduct complained of, Plaintiff filed with the Equal Employment Opportunity

Commission notice of Plaintiff's complaint for violation of Title VII for discrimination based on

sex and for retaliation.

14.     The E.E.O.C. assigned the matter Charge Number 520-2011-02791.

15.     On or about October 13, 2011, Plaintiff supplemented her July 2011 charge of

discrimination by filing with the Equal Employment Opportunity Commission a supplemental

charge of discrimination for violation of Title VII for discrimination based on sex and for

retaliation.

16.     On or about January 10, 2012, the EEOC issued a right to sue letter to Plaintiff.

17.     This action was commenced within ninety days after issuance of the right to sue

letter.

Facts Underlying Plaintiff's Claims for Relief

18.     Augustina Balu was appointed as a New York City Transit Authority Police

Officer on January 13, 1992 and became a member of the New York City Police Department

when the Transit Authority, Housing Authority and City Police Departments merged in 1995.

19.     She served as a Patrol Officer in various Transit Districts from her appointment

until approximately 2005, when she was involuntarily assigned to the Personnel Office at the

NYPD Transit Bureau, then located at 370 Jay Street, Brooklyn, New York.  She held various

posts until she was assigned to the Crime Prevention Unit at Transit Bureau Headquarters on or

about January 25, 2010.  She remained assigned to that Unit until January 2011.

-4-

20.     She served as a Patrol Officer at Transit District 4 in Brooklyn from her appointment until approximately 1999.

21.     She then served as a Patrol Officer at Transit District 23 in Queens from approximately 2000-2001.

22.     She then worked as a Patrol Officer at Transit District 32 in Brooklyn from 2001 until 2005, when she was involuntarily assigned to the Personnel Office at the NYPD Transit Bureau, then located at 370 Jay Street, Brooklyn, New York.

23.     Officer Balu, while still posted to the Transit Bureau's Personnel Office, was detached from 2006-2008 to the Brooklyn Impact program conducting training and doing administrative tasks.  She worked from Transit District 30 in Brooklyn.

24.     In or about February 2008, Officer Balu was returned to Transit Bureau Headquarters and, still as part of the Brooklyn Impact program, tasked with entering Transit Adjudication Bureau summonses.

25.     On or about January 25, 2010, Officer Balu was assigned to the Crime Prevention Unit at Transit Bureau Headquarters.  She remained assigned to that Unit until January 2011.

26.     In or about May 2010, Officer Balu was assigned to front desk security at Transit Bureau headquarters.

27.     In January 2011, Officer Balu was reassigned to the Manhattan Task Force VIPER Unit (Video Interactive Patrol Enhanced Response) and tasked with monitoring closed circuit television monitors surveilling Times Square and other locations on the overnight tours.  She was given Tuesdays and Wednesdays off.

28.     Beginning in or about December 2005 and continuing to her transfer from Transit Bureau Headquarters in January 2011 and continuing, one of Police Officer Balu's supervisor, Denis McAuliffe, a Lieutenant, sexually harassed Balu and then retaliated or caused retaliation against her when she refused his advances and propositions.

29.     Ms. Balu began working at the Transit Bureau Headquarters in or around February 2005.  Lieutenant McAuliffe had been working there for some time before and it was he who had arranged for and directed Officer Balu's transfer to the Personnel Division.

30.     Beginning soon after Balu's arrival at Transit Bureau Headquarters, Lieutenant McAuliffe began a campaign of sexual harassment against her, including, as detailed in part below, numerous unwelcome sexual remarks and advances and, in retaliation for not giving in to McAuliffe's advances, other adverse employment action.

31.     Despite the pervasive and continuing harassment and retaliation, and although the Police Department knew or should have known of McAuliffe's sexual harassment and retaliation, the Department enabled McAuliffe's harassing, discriminatory and retaliatory conduct and permitted a truly hostile work environment to develop.  Ms. Balu had to seek medical and legal help as a result.

32.     The sexual harassment and retaliation is due to Balu's gender and her refusal to submit to McAuliffe's advances and propositions.  This is in violation of Title VII of the Civil Rights Act of 1964, New York Executive Law § 296 et seq, and the Administrative Code of the City of New York § 8-107 et seq.

<u>Background</u>

33.     In 2005, Ms. Balu was serving as a Patrol Officer in the New York City Police Department's Transit Bureau, Transit District 32, a post she had held since approximately 2001.

34.     At and around January 2005, while delivering mail to Transit Bureau Headquarters at 370 Jay Street, Officer Balu was approached by Denis McAuliffe, the Lieutenant who headed up the Transit Bureau's Personnel Office, about voluntarily transferring to a position in his office.

35.     Balu told McAuliffe that she would consider it.  She said she could not tell him whether she wanted to interview for the position or whether she even wanted to leave patrol, something she enjoyed doing and was good at.

36.     Balu was next at Transit Headquarters perhaps a week later and was again approached by McAuliffe about the position and about interviewing for the position.  Later that day, Balu and McAuliffe had a perfunctory interview.  McAuliffe made clear that he wanted Balu to take the position and Balu told him she would get back to him during the next two weeks.

37.     A few days later, Balu received a telephone message from McAuliffe informing her that she was no longer to report to patrol duty but was instead to report to 370 Jay Street. Balu, as of mid-February 2005, had been involuntarily transferred from Patrol to Headquarters.

38.     Not soon thereafter, within approximately two months of her transfer, Officer Balu was subjected to the first in a series of instances of sexual harassment.

39.     In the Spring of 2005, Lieutenant McAuliffe directed Balu to retrieve computer speakers from a lower level floor of Transit Bureau Headquarters near the mail and locker rooms. McAuliffe stated that he was coming along in case Balu could not find them.  When they arrived,

McAuliffe pointed Balu toward the right corner of the room (gym area) and said that the speakers should be somewhere on the floor there.  When Balu walked towards McAuliffe with the speakers, McAuliffe took them from her hands and put them on a bench, then turned and grabbed Balu and pulled her to him, started breathing heavily and told her "come here, come hear, let me touch you" while trying to kiss the Officer.

40.     Balu told him to cut it out, stop and get off her.  She raised her voice and McAuliffe let go of her.  She then walked towards the door and McAuliffe again grabbed Balu and pressed against the door with his hand to keep it from opening.

41.     Balu turned around to push McAuliffe back.  He began again to try to feel up and down Officer Balu's shirt, grabbing and pressing across from her right to left breast.  As Officer Balu tried to grab McAuliffe's hand and get it away, he squeezed her breast and, as she pushed him away, he kept hold of her shirt, popping two buttons open and almost tearing one of them off.

42.     Balu threatened to scream, telling McAuliffe that the Officer posted outside the room would hear.  McAuliffe told Balu to be quiet and to calm down, to "Forget it! Relax! Go."

43.     After this encounter, McAuliffe started consistently leaving Balu notes on her desk, using post-its or his personalized message pads.  Some said things like "Call Me!  I'm working late.  See me." or "Stop by my office, working late tonight."

44.     McAuliffe also left voicemails for Balu to call him.

45.     McAuliffe would often come by Balu's desk and walk around the side of the chair, making remarks such as "Nice" or  "You made my day" and other, similar and unwelcome remarks.

46.     During this time, McAuliffe would call Officer Balu in to his office and direct her to look for things, file or to get him books and magazines out of a bottom draw, often making unwelcome and harassing remarks like "Do you need a private lesson in filing" or "Nice!" while Balu was bending or reaching.

47.     McAuliffe also told Balu that she needed to change the kind of underwear she wore, saying that she needed more lace, that cotton was not sexy and calling her underwear "granny panties."  When Balu questioned how he knew anything about her underwear, McAuliffe replied "What do you think I'm doing when I come to your desk or walk around you?"

48.     McAuliffe would walk by Balu and say things like "wearing red today.  Nice." or would just whisper the color as he walked near the Officer.

49.     One day in 2005, while Balu was near the door to his office, McAuliffe grabbed Balu by her wrist, telling her to come here, that he wanted to show her something.  Balu entered the office and McAuliffe reached for his pants.  The Officer began to leave and McAuliffe told her not to, that he wanted to show her something and again took hold of Balu's wrist and attempted to push the door closed.  He then displayed to Balu his underwear, which was light blue, stating "look, we're wearing the same color."

50.     Another time while in McAuliffe's office in approximately June 2005, McAuliffe grabbed Balu and pulled her behind Sergeant William Ponce's desk and toward a wall.  She pulled away and he pulled back while holding Balu's left wrist.  He pulled her into the desk, knocking over a "Star Trek" model.  He let go and when Balu turned for the door, Captain Donnack was standing in the doorway with a blank look on his face.  Balu left the office.

51.     Another time while in McAuliffe's office in 2005, McAuliffe showed Balu a small window open on one of the four computers in his office which had pornography displayed. McAuliffe laughed as Balu exclaimed and turned away.  She asked McAuliffe why he would have something like that in his office in Transit Bureau headquarters.

52.     Another time, Lieutenant McAuliffe took Balu and Police Officer Jocelyn Flood to a bar while on duty.  McAuliffe got angry at Balu for refusing to drink and called her boring.

53.     After receiving a message on her cell phone from McAuliffe in or about Fall 2005 saying "This is the last time you are blowing me off," Balu went to her desk and found a stack of bullet proof vests.  Lieutenant McAuliffe had had them put there with no direction to Balu as to where to take them.  Captain Patrick Kerins, Commanding Officer Transit Bureau, came to the Personnel floor, saw the vests and screamed at Balu to take the vest and go, that it was an order and that she had better do it.  When Balu sought to question Kerins about the vest, the Captain shouted his orders louder.  As she gathered the vests, she was at last to to go to (as she remembers) 20th Street and to ask for the Vest Unit.

54.     When Balu returned from delivering the vests, Captain Kerins called her to his office and discussed the incident.  The Captain appeared to be aware that McAuliffe was subjecting Balu to harassment

55.     Later that day, Balu was approached by Police Officer Myra Liciaga, a PBA delegate, who told Balu that Lieutenant McAuliffe was supposedly preparing a Command Discipline for insubordination.  Balu told Liciaga that McAuliffe was creating very difficult situations, was abusing her and abused his authority, that McAuliffe was sexually harassing her. She told Liciaga that her workplace had become hostile.

-10-

56.     At around this time, within a few days of the incident involving the vests, Balu went into the Lady's Room and cried.  Things were getting overwhelming, with the stress of a hostile work environment caused by McAuliffe together with the deteriorating health condition of Balu's mother.

57.     Officer Michelle Pacheco followed Balu in to the bathroom and the two spoke about about some of the sexual harassment McAuliffe had engaged in –  how he kept leaving notes for Balu to meet him, how he tried to trap Balu in the gym and almost ripped the buttons from her shirt and had grabbed Balu and forced his tongue in her mouth, among other things.

58.     Later that day, Sergeant William Ponce approached Balu and told her that he knew what she was going through and knew what McAuliffe had been doing to her.

59.      A few days later, Officer Pacheco and Balu were approached by Lieutenant McAuliffe and told to prepare to be transferred out of the Personnel Unit based on a change in the administration; the Chief of the Transit Bureau, Henry Cronin, was retiring, and the Bureau was getting a new Chief and that Pacheco and Balu's positions would be needed for the new administration.

60.      McAuliffe told Pacheco and Balu that he was going to Chief Cronin's office for approval of the proposed transfers.  McAuliffe returned and said that he had spoken with the Chief and that they needed to pick a place, and fast.

61.     Balu prepared a request for transfer.  By chance, Chief Cronin stopped to speak with Officer Balu that same day as he was walking by and, during their conversation, it appeared to Balu that Chief Cronin was first learning of the proposed transfer.  She tried to pass the matter off as a misunderstanding, but the Chief directed Balu to his office to continue the discussion.

-11-

He telephoned the Personnel Office and the Chief of the Department's Office at One Police Plaza and also spoke to a Lieutenant Kovoras, Assistant to the Chief of the Department.

62.     When Balu saw Lieutenant McAuliffe the next work day, Balu asked to hand in her transfer request and he told her not to, that it was out of his hands, that it was "with the big brass now," and walked away angrily.

63.     Late in 2005 or early in 2006, following a retirement party for an officer from the Crime Analysis section at Headquarters (first name George), Lieutenant McAuliffe insisted on dropping Officer Balu off by her car, which was parked on Pearl Street in downtown Brooklyn.

64.     Once they arrived, McAuliffe grabbed Balu's wrists and she tried to get out of the vehicle.  He had his penis out and started to pull and place Balu's hand against it.  She told him to let go because she was going to be sick and wanted to go home.  McAuliffe continued to hold her wrist and, saying "Okay, Okay, not in my car," and opened the door.  Balu threw up and as she came up for air, McAuliffe grabbed her face, put a mint in her mouth and pushed himself on top of her, shoving his tongue in her mouth as he squeezed her breasts.  Balu grabbed his hands to take them from her body and started yelling at McAuliffe to get the fuck off her and to let her go home.  McAuliffe told her to stop screaming and, while breathing heavily, told Balu how good she felt to him and how she should at least just put her mouth on his penis and suck it.  Balu continued yelling at him and pushing him off.  McAuliffe saw the headlights of another car and Balu was able to get out of the car and leave.

65.     McAuliffe has since reminded Balu of that night in his car, telling her that when she grabbed his hands to get them off of her, she had pressed his hands harder against her breasts and that that had turned him on.

-12-

66.     Sometime around the December 2005 transit strike, while working long hours, Lieutenant McAuliffe told Balu he was going to a room to get some sleep and to make sure that she or Officer Flood wake him, up unless they wanted to lay down with him.

67.     Between incidents of harassment and unwelcome remarks and conduct, the Lieutenant would act as if nothing had happened.  Other times he would appear angry or very moody.  Sometimes, he would seem very distant and detached.

68.     Soon after Chief Cronin's retirement, Balu met with Inspector John Moore, the Adjutant for the Transit Bureau, and told that there was a new initiative that Transit needed people to run called the Impact program and that he wanted her involved.   Balu was assured that her position in Personnel was secure if she wanted to return or if the Impact initiative ended.

69.     From 2006-2008, Balu worked not at Transit Headquarters but at Brooklyn Impact out of Transit District 30 performing administrative work, such as roll calls, details and projections.  Defendant McAulife remained one of Plaintiff's supervisors.

70.     During this time, moreover, McAuliffe's unwelcome advances and remarks continued.  In the Fall of 2007, for instance, while standing outside of a Department van driven by Police Officer George Bazile and parked in front of 130 Livingston, Lieutenant McAuliffe propositioned Balu, telling her that they should meet at Jay Street headquarters so that he could perform oral sex on her.  Balu told McAuliffe that he was a sick person, and McAuliffe told Officer Bazile to drop Balu off at District 30.

71.     Balu was returned to Transit Headquarters at 130 Livingston Street in Brooklyn in January or February 2008 to run, as part of the Impact program, a database for Transit Adjudication Bureau Summonses.

72.     In mid-2008, Inspector Moore was replaced as Balu's immediate supervisor by Sergeant Jennifer Sherman, who Balu helped train.  Soon thereafter, Balu requested to speak with Sergeant Sherman about Balu leaving Transit Headquarters and mentioned that she was not viewed well by Lieutenant McAuliffe and Captain Kerins.  Sherman appeared not to want Balu to transfer, telling her to give her a chance to address and fix whatever was going on and that if Balu was still not happy there then she would understand.  Balu's work situation improved for a few months, but then again became hostile and negative.

73.     At around this time, Balu began to develop a repetitive motion disorder with her right arm and both hands from entering an enormous amount of T.A.B. Summonses (about twenty-seven thousand).  She asked Sergeant Sherman for help, as the work load was increasing, was time sensitive and was becoming more and more demanding, but did not receive steady assistance.

74.     The injury progressed and Balu was placed on limited and then restricted duty beginning on or about March 31, 2009 and eventually moved to front desk security.

75.     Lieutenant McAuliffe, in retaliation for Balu's refusal of his unwelcome sexual advances, would not approve of Balu's Line of Duty injury designation, forcing the Officer to challenge the refusal.  The Line of Duty designation was finally approved on or about October 7, 2009.

76.     At around this time, Sergeant Sherman, at the direction and encouragement of Lieutenant McAuliffe and others, told Balu that she was going to replace her and that Balu needed to pick a new command.   Balu, who had begun handling court appearances control late in 2008, reminded Sherman that the Sergeant had previously told Balu that she could continue

-14-

handling the court appearance control system.  The Sergeant directed Balu to consider where she wanted to be transferred.

77.     Balu contacted Inspector Moore to discuss that she was leaving Headquarters. She explained that Sergeant Sherman felt that Balu could no longer perform to the Sergeant's expectations due to the injury but that she could still perform administrative duties and that the medical restrictions mainly applied to excessive repetitive movement.  Balu remained at Headquarters in the Impact program.

78.     In or about late 2009, while standing by Police Officer Helena Nilsen in the Special Operations Division at Headquarters at 130 Livingston Street, Lieutenant McAuliffe approached them and asked about a female Sergeant, Joanne Guidice, who worked there. McAuliffe asked the Officers if they ever saw that Sergeant in the locker room while she changed and asked Balu if she would sneak a picture of the Sergeant with her phone.  He told Balu that he wasn't interested in the Sergeant's breasts "because they were fake," he just wanted a shot of her groin in her underwear, and pointed to the area on himself.

79.     Also in 2009, McAuliffe had remarked to Balu that she "will be a notch on my belt and I'll decide whether its quality or just more quantity for me."

80.     On or about June 24, 2009, Officer Balu's car was summonsed while parked at Livingston and Jay Street despite being parked within Departmental Guidelines and with a Police placard displayed.  McAuliffe caused the summons to be issued in retaliation for Balu's refusal of his unwelcome propositions and advances.

81.     The Department thereafter failed to adjudicate the ticket in a timely manner and the vehicle was towed on or about December 9, 2009 as a scofflaw due to the outstanding summons.

82.     About nine days after being impounded, and after much effort by Balu, the car was released from the tow pound with no penalties.

83.     On Friday, January 22, 2010, Sergeant Sherman, Captain Kerins and Balu met about Balu's performance.

84.     Later that day, the Captain called Balu back to his office and told her that she was being transferred to the Crime Prevention Unit Sergeant.

85.     On or about January 25, 2010, the next Monday, Balu started working at the Crime Prevention Unit at Transit Bureau Headquarters.  She remained at that Unit until her transfer in January 2011 to the Manhattan Task Force VIPER Unit.

86.     After a month or so at Crime Prevention, Balu and Officers Reggie Ransom and Police Officer Richard Pena met with Sergeant Bill Buckley.   During the meeting, Sergeant Buckley said words to the effect of "Tina, I want to tell you that,  I don't care, I'll say it in front of them [the other officers], that when you were assigned to Crime Prevention by Captain Kerins it was with the understanding that you should be messed with.  Well, I go by what I see and I want to say, Welcome.  Your performance has been more than satisfactory and above all my expectations.  I'm sure you already know that there are a few people here that wanted to see you fall.  Well, you didn't so poop on them, and as long as I don't have a problem, you don't have a problem.  So, like I said, Welcome."

87.     Throughout 2010, Lieutenant McAuliffe would say things to Balu like "Six years, Tina, six years," and that he was "tired of waiting," that "it's over" and to "say hello to Mrs. Balu for me," suggesting to Officer Balu that she was a lesbian.

88.     Officer Balu attended a June 2010 Police Department retirement party for Jocelyn Flood at a bar restaurant called Taino's.  Lieutenant McAuliffe intercepted Balu as she went to leave the event, grabbing and holding her wrist and again propositioning her, asking her for "thirty minutes in the back seat" of her car.  Balu told McAuliffe to "get off me" and demanded he let go of her wrist.  She left the party.

89.     During the Summer of 2010, Balu learned that Lieutenant McAuliffe was remarking to various people that Balu was not speaking to him and that she must be angry with him.  Balu told McAuliffe that that was not the case and that, when she would greet him in the morning, he would not respond or even acknowledge the greeting.

90.     Later that day, McAuliffe said to Balu words to the effect that it was not that he was ignoring her when she would greet him in the morning, but that he would "have my headphones on with my music turned up loud and, when I walk past you, I picture you there without that shirt, doing things to you that I couldn't say, so I stay focused so I don't lose that image."

91.     In the second half of 2010, before October 2010, Lieutenant McAuliffe again propositioned Balu after he had interrupted a conversation between Balu and a male Transit Authority employee.  After the employee left, the Lieutenant stated that he had saved Balu "from that nut" and that the employee "stops by you a lot.  Like always, I save you, and I'm still waiting for you to return the favor.  You need to learn to reciprocate."

-17-

92.     On or about October 27, 2010 at 11:30 a.m., a female Cadet, Max Mateo, talked to Balu about how "something is wrong with Lieutenant McAuliffe."  The Cadet told Balu that she did not enjoy working at Headquarters and reminded Balu that she previously had told Balu about unwelcome sexual advances by Lieutenant McAuliffe, that he would call the Cadet wanting to go out with her, that McAuliffe would text her off duty, often touch her hair and making her very uncomfortable.  Balu told the Cadet that she understood and told her about sexual harassment Balu had gone through.

93.     Officer Balu believes that Cadet Mateo has also mentioned McAuliffe's sexual harassment to Police Officer Michele McNaughton, Officer Liciaga and others.

94.     On or about November 2, 2010, Balu learned that Lieutenant McAuliffe, in retaliation for her refusal of his propositions and advances, was directing that Balu be closely monitored and inconvenienced.  McAuliffe was going to change her fixed meals to 0930 and continued to speak negatively about her Line of Duty designation.

95.     On November 3, 2010 at about 8:20 a.m., Lieutenant Mastrata advised Balu that her meal would be at 0930 hours and that he had nothing to do with that, that it was "ordered by Lieutenant McAuliffe."

96.     Also in or about November 2010, McAuliffe yelled at Balu in his office in front of PBA Delegate Liciaga when Balu told him that she felt he was harassing her.  McAuliffe repeated to Balu how easily he could have her be transferred to the Manhattan Task Force VIPER Unit, which is an undesirable post and essentially a dumping ground for problem officers, and then screamed out two or three times "but we're not gonna do that."

-18-

97.     On Friday, January 7, 2011, Officer Balu was advised of her transfer to Manhattan Task Force VIPER Unit and that, beginning on Monday, January 10, 1011, she would be handling the 6:30 a.m. to 3:00 p.m. tour and that her regular days off would be either Friday/Saturday or Sunday/Monday.

98.     Lieutenant McAuliffe, however, had directed and arranged, in retaliation against Balu for her refusal of his unwelcome propositions and advances, that only the midnight tour with either Tuesday/Wednesday or Wednesday/Thursday days off be made available to Balu, and that was the tour and days off she was given.

99.     On Monday, January 10, 2011, Officer Balu called the NYPD's Office of Equal Employment Opportunity and thereafter was interviewed by a Detective Johnson at One Police Plaza.  Officer Balu was advised on July 6, 2011 by E.E.O. that the investigation was complete and McAuliffe had been reinstructed on E.E.O. policies and the prohibition against inappropriate behavior.

100.    On January 12, 2011, Officer Balu spoke with PBA trustee Mike Morgillo and was advised that it appeared that the only way Balu could not be subjected to midnight tours would be her transfer out of the Transit Bureau entirely.

101.    In January 2011, Officer Balu was reassigned to the Manhattan Task Force VIPER Unit (Video Interactive Patrol Enhanced Response) and tasked with monitoring closed circuit television monitors surveilling Times Square and other locations on the overnight tours.

102.    On or about July 11 2011, Officer Balu filed a complaint with the E.E.O.C. charging sexual harassment and retaliation.  The Complaint was assigned Charge Number 520-2011-02791 by the E.E.O.C.

103.     On September 2, 2011, the E.E.O.C.'s mediation unit contacted Ms. Balu's attorney indicating the the New York City Police Department was interested in attempting to mediate and settle the Complaint.  On September 12, 2011, the E.E.O.C. was advised that Ms. Balu declined mediation at this time.  Ms. Balu's Complaint was thereafter forwarded to the E.E.O.C.'s investigation unit.

104.     Beginning in late August 2011, Ms. Balu began to be "lent out" to other commands under the pretext that administrative assistance was needed at those commands when, in fact, it was not.  Ms. Balu, for instance, was sent to District 3 in Washington Heights on that pretext.

105.     On approximately September 30, 2011, Ms. Balu was directed to report to the District 17 surgeon regarding status of firearms; she had previously been issued a medical excuse relieving her from annual firearm requalification.  When she appeared at the District 17 surgeon's office, Officer Balu met with a female Sergeant who did know why Balu had been directed to report and that the Officer had not been scheduled by them to appear.  The District Surgeon, Dr. Ciuffo, and the female Sergeant then asked if there was anyone who "might want to mess with her."  Officer Balu told the District Surgeon that she had filed a complaint of sexual harassment.  The Surgeon told Balu that he and the Sergeant were not happy about being used in this way, that is, to harass and punish Ms. Balu.

106.     These and other employment actions are in retaliation for Ms. Balu's E.E.O.C. Complaint and her decision to forgo mediation and instead seek to exercise her rights.

107.     Office Balu has also mentioned McAuliffe's sexual harassment to Police Officer James Lanflisi, Officer Helena Nilsen, S.P.A.A. Jenny  Lopez, Cadet David Salazar, Officer

Michelle Pacheco, Sergeant William  Ponce, Police Officer Daniel Blanco, Officer Jocelyn

Flood, Police Officer MichaelAnn Drapala, Police Officer Tabitha Jennings, Lieutenant Nelson

Tolentino, Lieutenant Joe Nugent and others.

108.    The acts and omissions complained of herein deprived Tina Balu of her rights and

caused her to suffer mental and emotional upset, loss of benefits including a reduced pension,

lost wages and other injuries.

109.    Defendants, at all times relevant, acted intentionally, willfully, maliciously,

negligently, with discriminatory animus, and with reckless disregard for and deliberate

indifference to Plaintiff's rights and well-being.


FIRST CLAIM FOR RELIEF FOR VIOLATING PLAINTIFF'S
RIGHTS UNDER TITLE VII, 42 U.S.C. §2000e-2(a) AND §2000e-3(a)

110.    Plaintiff repeats the allegations of paragraphs 1-109 as though fully stated herein.

111.    By the actions described, Tina Balu was deprived of her rights secured by Title

VII, i.e., 42 U.S.C. §2000e-2(a) and §2000e-3(a), including, but not limited to her right to be free

from discrimination based on gender, free from sexual harassment and freedom from retaliation

for refusing to submit to unwelcome sexual advances and for complaining about sexual

harassment.

112.    Plaintiff was subjected to sex discrimination that created an intimidating, hostile

and offensive working environment.

113.    That such harassment was severe and pervasive.

114.    That Defendant McAuliffe was in a position to and did adversely affect the terms and conditions of Plaintiff's employment.

115.    Defendant City of New York knew of and disregarded Mr. McAuliffe's propensity to harass and annoy other Department employees based on gender.

116.    As a consequence thereof, Tina Balu has been injured.

SECOND CLAIM FOR RELIEF FOR VIOLATING PLAINTIFF'S
RIGHTS UNDER NEW YORK STATE EXECUTIVE LAW §296 ET SEQ.

117.    Plaintiff repeats the allegations of paragraphs 1-109 as though fully stated herein.

118.    By the actions described, Tina Balu was deprived of her rights secured New York State Executive Law §296 et seq., including, but not limited to her right to be free from discrimination based on her gender, free from sexual harassment and freedom from retaliation for refusing to submit to unwelcome sexual advances and for complaining about sexual harassment.

119.    Plaintiff was subjected to sex discrimination that created an intimidating, hostile and offensive working environment.

120.    That such harassment was severe and pervasive.

121.    That Defendant McAuliffe was in a position to and did adversely affect the terms and conditions of Plaintiff's employment.

122.    Defendant City of New York knew of and disregarded Mr. McAuliffe's propensity to harass and annoy other Department employees based on gender.

123.    As a consequence thereof, Tina Balu has been injured.

THIRD CLAIM FOR RELIEF FOR VIOLATING
PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
CODE OF THE CITY OF NEW YORK §8-502(a) AND §8-107 et seq.

124.    Plaintiff repeats the allegations of paragraphs 1-109 as though fully stated herein.

125.    By the actions described, Tina Balu was deprived of her rights secured by New York City Administrative Code §8-502(a) and §8-107 et seq. including, but not limited to her right to be free from discrimination based on her gender, free from sexual harassment and freedom from retaliation for refusing to submit to unwelcome sexual advances and for complaining about sexual harassment.

126.    Plaintiff was subjected to sexual and racial discrimination that created an intimidating, hostile and offensive working environment.

127.    That such harassment was severe and pervasive.

128.    That Defendant McAuliffe was in a position to and did adversely affect the terms and conditions of Plaintiff's employment.

129.    Defendant City of New York knew of and disregarded Mr. McAuliffe's propensity to harass and annoy other Department employees based on gender and race.

130.    As a consequence thereof, Tina Balu has been injured.


Request for Relief

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

(A)    Declaratory relief as follows:

1.    A declaration that Plaintiff's right under Title VII, i.e., , 42 U.S.C. §2000e-2(a) and §2000e-3(a) were violated;

2.       A declaration that Plaintiff's rights under New York
         State Executive Law §296 et seq., were violated;

3.       A declaration that Plaintiff's rights under New York
         City Administrative Code §8-502(a) and §8-107
         were violated;

(B)      Compensatory damages in an amount to be fixed at trial;

(C)      By reason of the wanton, willful and malicious character of the conduct
         complained of herein, punitive damages from the individual defendant in
         an amount to be fixed at trial;

(D)      An award to plaintiff of the costs and disbursements herein;

(E)      An award of attorney's fees under under the relevant statutes, including but
         not limited to 42 U.S.C. §2000e-5K and New York City Administrative
         Code §8-502(f); and

(F)      Such other and further relief as this Court may deem just and proper.

Dated: February 10, 2012
       New York, New York

                                        The Law Office of Fred Lichtmacher, PC
                                          Attorney for Plaintiff
                                        350 Fifth Avenue, Suite 7116
                                        New York, York 10118
                                        (212) 922-9066


                                        _____
                                        By: Matthew Flamm

-24-